John LOMELO, Jr.,
Petitioner–Appellant,

v.

UNITED STATES of America,
Respondent–Appellee.

No. 88–5911.

United States Court of Appeals,
Eleventh Circuit.

Jan. 16, 1990.

Kennth W. Lipman, Siegel & Lipman, Boca Raton, Fla., for petitioner-appellant.

John J. O'Sullivan, Linda Collins Hertz, Harriett R. Galvin, Asst. U.S. Attys., and Ann Hayes, Miami, Fla., for respondent-appellee.

Before FAY and KRAVITCH, Circuit Judges, and CASTAGNA*, District Judge.

KRAVITCH, Circuit Judge:

Appellant, John Lomelo, convicted on several counts of mail fraud and extortion, appeals from the district court's denial of his motion to vacate his conviction and sentence pursuant to 28 U.S.C. § 2255. Lomelo was convicted on eight counts of a twelve count indictment. The jury found him guilty on one count of conspiring to commit mail fraud in violation of 18 U.S.C. § 371 (Count I), six counts of mail fraud in violation of 18 U.S.C. § 1341 (Counts II–VII), and one count of conspiring to commit extortion in violation of 18 U.S.C. § 1951 (Count VIII).

Lomelo claims that the rule announced by the Supreme Court in *McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), removing the citizens' intangible right to good government from the scope of the mail fraud statute, renders his conviction for mail fraud invalid. He further claims that his conviction for extortion must be vacated due to prejudicial spillover of the evidence on the mail fraud counts. We affirm.

## I. FACTS

Lomelo was mayor of the City of Sunrise, Florida ("Sunrise" or "City") at the time of the events leading to his conviction. Lomelo's convictions for conspiracy and mail fraud resulted from his participation in a scheme by which Marvin L. "Spike" Leibowitz, a friend of Lomelo's and a codefendant at trial, received funds for services to the city that Leibowitz never performed. The firm of Craig A. Smith and Associates ("Smith"), consulting engineers to the City of Sunrise, was used as a conduit through which Leibowitz obtained these funds.[1]

In 1982, Leibowitz, a lobbyist, came to Smith and informed him that he had been hired by the city for two projects on which Smith was currently working. One of these projects, the "201 Project," involved the regionalization of wastewater; the other project, "Sunrise Industrial Park," involved the development of land for industrial use. Leibowitz told Smith that he was to receive $36,000 for his services on these projects. He also informed Smith that payments for his services would be made by Sunrise, but that he would bill Smith, who, in turn, should bill Sunrise for Leibowitz's fees. Without verifying the invoices that

---

* Honorable William J. Castagna, U.S. District Judge for the Middle District of Florida, sitting by designation.

1. The funds in question were primarily the result of bond issues for city improvements.

Leibowitz gave him, Smith passed them along to the city via Lomelo's office, including Leibowitz's invoices as "out of pocket costs." Lomelo's office then sent a disbursement letter to the city's finance director, who, per Lomelo's instructions, signed it and sent it back to Lomelo. As each of these projects involved disbursements from bond issues, the letter was then sent by Lomelo's office to the bond trustee at the bank who, in turn, disbursed the funds to Smith.[2] Between 1982 and 1983, Leibowitz received $52,000 in this manner.

In 1983, Leibowitz also received city funds for services on two other projects not involving bond issues or a bond trustee.[3] Though Smith's involvement in these two projects was minimal, Smith was again used as a conduit for funds. At trial, the government presented evidence to show that none of the services billed for by Leibowitz were ever performed and that Lomelo played a key role in insuring payment on the false invoices. In the case of one project, the city's finance department was only willing to issue a check after Lomelo personally intervened and directed the department to do so.[4] The defense at trial was that the evidence was insufficient to show either that Lomelo knew false invoices were being submitted or that he had caused the use of the mails.

---

**2.** The mailings of these letters to the bank with the invoices and documentation enclosed formed the basis for each of the substantive fraud counts.

**3.** These projects were the "Annexation of 84 South" ("84 South") and the "extension of utility services at 136th Avenue and Flamingo Road" ("Utilities").

**4.** Leibowitz went directly to the finance director's office requesting payment of $20,000 for his "services" in connection with the Utilities project. The finance director refused to pay Leibowitz's invoice without approval from the mayor. Lomelo then informed the finance department that if Leibowitz returned with an invoice from Smith, the finance department should issue a check to Smith, who in turn would pay Leibowitz. Leibowitz returned with such an invoice.

**5.** Section 1341 provides in pertinent part:

Lomelo challenged his convictions on direct appeal, alleging error in several evidentiary rulings of the trial court. He did not challenge the indictment, the charge to the jury, or the sufficiency of the evidence. The Eleventh Circuit affirmed the convictions. *United States v. Lomelo*, 792 F.2d 1124 (11th Cir.1986) (mem.).

On June 24, 1987, over one year after Lomelo's conviction was affirmed on appeal, the Supreme Court decided *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), which held that the mail fraud statute, 18 U.S.C. § 1341,[5] is limited in scope to the protection of property rights and does not protect a citizen's intangible right to good government.[6] Lomelo then moved to vacate his convictions and sentence pursuant to 28 U.S.C. § 2255, claiming that his convictions on counts I—VIII were invalid. The district court, after a hearing, issued an order denying Lomelo's motion, holding that Lomelo had not shown "actual prejudice" from the government's reference in the indictment to intangible rights. The court found that the government had not relied exclusively on a deprivation of intangible rights theory, nor had the jury instructions focused on that theory.

## II. DISCUSSION

Lomelo seeks collateral relief under 28

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, ... for the purpose of executing such scheme or artifice or attempting to do so [uses the mails or causes them to be used,] shall be fined not more than $1,000 or imprisoned not more than five years, or both.

**6.** We note in passing that on November 18, 1988, Congress passed the Anti–Drug Abuse Act of 1988, Pub.L. No. 100–690, Title VII, § 7603(a) which contained a section amending the mail fraud statute. 18 U.S.C.A. § 1346 now states that:

For the purposes of this chapter, the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.

Because this act came into effect after Lomelo filed his petition for habeas corpus, the amendment does not govern this case.

U.S.C. § 2255,[7] the federal habeas corpus statute, on the ground that he was convicted for acts which the law, as clarified in *McNally*, does not make criminal.[8]

In *United States v. Frady*, 456 U.S. 152, 167–68, 102 S.Ct. 1584, 1594, 71 L.Ed.2d 816 (1982), the Supreme Court made it clear that "to obtain collateral relief based on trial errors to which no contemporaneous objection was made, a convicted defendant must show both (1) 'cause' excusing his double procedural default, and (2) 'actual prejudice' resulting from the error of which he complains."[9] The cause and actual prejudice standard for section 2255 petitions has been applied several times by this court. *See Greene v. United States*, 880 F.2d 1299, 1305 (11th Cir.1989); *Parks v. United States*, 832 F.2d 1244, 1245–46 (11th Cir.1987).

In determining whether cause exists, the Supreme Court has held that "the question is not whether subsequent legal developments have made counsel's task easier, but whether at the time of the default the

claim was 'available at all.'" *Smith v. Murray*, 477 U.S. 527, 537, 106 S.Ct. 2661, 2667, 91 L.Ed.2d 434 (1986).

■ It is undisputed that Lomelo failed to object either at trial or on direct appeal to the government's use of the intangible rights theory. However, we have no difficulty agreeing with the district court that Lomelo has shown cause for this double procedural default. At the time of Lomelo's trial and appeal, it was settled law in this circuit, as in all other circuits, that 18 U.S.C. § 1341 protected the citizens' intangible right to good government. *See, e.g. United States v. O'Malley*, 707 F.2d 1240, 1246–48 (11th Cir.1983).[10]

Although Lomelo has shown cause for his previous failure to allege that the government impermissibly relied on an intangible rights theory to obtain a conviction, he must still show that any reliance on such a theory caused him "actual prejudice." That is, he must demonstrate that the reference to intangible rights in the indictment, the jury instructions, or during

**7.** 28 U.S.C. § 2255 states in part that:

A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

**8.** We note as a threshold matter that *McNally* applies retroactively to convictions that became final before *McNally* was handed down. In *United States v. Gordon*, 836 F.2d 1312, 1314 (11th Cir.1988), the Eleventh Circuit specifically reserved the question of whether *McNally* should be applied retroactively to convictions that were already final. Since *Gordon*, however, this circuit has made it clear that "a decision which determines that Congress never intended certain conduct to fall within the proscription of a criminal statute must necessarily be retroactive." *Belt v. United States*, 868 F.2d 1208, 1211 (11th Cir.1989) (applying *McNally* retroactively). *See also, United States v. Elkins*, 885 F.2d 775, 781 (11th Cir.1989).

In holding that *McNally* applies retroactively, the Eleventh Circuit joined the other circuit courts of appeal which have addressed the question and reached the same result. *See United*

*States v. Ochs*, 842 F.2d 515, 519–20 (1st Cir. 1988); *Ingber v. Enzor*, 841 F.2d 450, 453 (2d Cir.1988); *United States v. Osser*, 864 F.2d 1056 (3d Cir.1988); *United States v. Mandel*, 862 F.2d 1067, 1075 (4th Cir.1988); *United States v. Marcello*, 876 F.2d 1147, 1153 (5th Cir.1989); *Callanan v. United States*, 881 F.2d 229, 232 (6th Cir.1989); *Magnuson v. United States*, 861 F.2d 166 (7th Cir.1988); *United States v. Shelton*, 848 F.2d 1485 (10th Cir.1988) (en banc).

**9.** The "cause and actual prejudice" standard for federal habeas petitioners mirrors the standard used to evaluate collateral attacks on state convictions. *See Francis v. Henderson*, 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976); *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

**10.** As we stated in *Belt*:

*McNally* overturned the line of cases relying on the intangible rights theory, which interpreted the mail and wire fraud statutes as proscribing schemes by government officials to defraud citizens of their intangible right to honest and impartial government. These cases held that dishonest acts by government officials were violations of the mail or wire fraud statutes even though the schemes were not aimed at depriving the victims of money or property.

868 F.2d at 1211 n. 3 (citing cases from other circuits).

trial, worked to his *"actual* and substantial disadvantage...." *Frady,* 456 U.S. at 170, 102 S.Ct. at 1596 (emphasis in original). We agree with the district court that Lomelo has not demonstrated actual prejudice.

### A. The Indictment and the Trial

A key factor in the assessment of a *McNally* claim is the wording of the indictment on which the defendant's conviction is based. *See United States v. Dynalectric Co.,* 859 F.2d 1559, 1570 (11th Cir.1988). The conspiracy to commit mail fraud is alleged and described in Count I of Lomelo's indictment. Count I states that the defendants [11] conspired to violate section 1341, by using the United States mail

> in furtherance of a scheme and artifice to defraud the people of the City of Sunrise in that the defendants JOHN LOMELO JR. and JOHN E. MONTGOMERY approved payments by the City of Sunrise to the defendant, MARVIN L. "SPIKE" LEIBOWITZ, using Craig A. Smith and Associates of Florida, Inc. as a conduit, well knowing that no services were rendered by the defendant, MARVIN L. "SPIKE" LEIBOWITZ, in exchange for said payments as more fully set forth in Counts II, III, IV, V, VI, and VII, the factual allegations of which are incorporated herein by reference.

The object of the defendants' scheme and artifice to defraud is set forth in paragraph 2 of Count II of the indictment, which is then incorporated in all the remaining mail fraud counts (Counts II–VII). Count II states that the defendants devised a scheme and artifice:

> (a) to defraud the people of the City of Sunrise of their right to have the business of the city conducted honestly, fairly, impartially, free of corruption, collu-

sion, partiality, disloyalty, dishonesty, and fraud; *and*

> (b) to defraud the people of the City of Sunrise of public funds designated for the improvement of the city and for the benefit of its people by authorizing the payment of public funds to the defendant, MARVIN L. "SPIKE" LEIBOWITZ, well knowing that said defendant, MARVIN L. "SPIKE" LEIBOWITZ performed no services for the City of Sunrise.

(emphasis added). Part (a) of Count II refers to the intangible rights theory and part (b) to traditional fraud. It is clear that part (a) is now invalid under *McNally.*[12] It is important to note, however, that the counts are stated in a conjunctive rather than a disjunctive fashion. This suggests that in order to convict on the basis of the indictment, the jury must have found Lomelo guilty of both part (a) and part (b) of Count II.

Lomelo claims, however, that the jury may have convicted him simply on the basis of the intangible rights language included in the indictment. Although a conviction will not be overturned on the basis of *McNally* merely because the indictment mentions the intangible rights theory, Lomelo will prevail if he can demonstrate that the jury *could* have relied on that theory to convict him. *Dynalectric,* 859 F.2d at 1570; *Belt,* 868 F.2d at 1213.

Lomelo correctly asserts that *McNally* mandates that the scheme to defraud result in loss of money or property and not intangible rights.[13] He then argues that the government must have been relying on an intangible rights theory because it did not produce any evidence of economic loss at trial. Instead of relying primarily on the trial transcript to support this assertion, Lomelo claims that the government could

---

**11.** Also named in the indictment were Marvin L. "Spike" Leibowitz and John E. Montgomery, a City of Sunrise councilman.

**12.** The indictment in *McNally* alleged a scheme to defraud the citizens of Kentucky "of their right to have the Commonwealth's business and its affairs conducted honestly, impartially, free from corruption, bias, dishonesty, deceit, offi-

cial misconduct, and fraud." 483 U.S. at 353–54 n. 4, 107 S.Ct. at 2878 n. 4.

**13.** In *Carpenter v. United States,* 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), the Court made it clear that the mail fraud statute *does* allow prosecution for a scheme to defraud another of *intangible* property rights. *See also Belt,* 868 F.2d at 1213.

not have shown that the people of Sunrise were defrauded of money because the money dispersed to Leibowitz was money belonging to the bondholders and not the people of the City of Sunrise. Lomelo argues that if the bank disbursed the funds based on fraudulent invoices, the loss was that of private bondholders and not the government.

■ We find this argument without merit. In the present case, the source of money for the bonds is irrelevant as is the fact that private bondholders received revenues from the bonds. The fact remains that the funds from the bond issue were to be used for public improvements and municipal projects. Only the City or designated city officials were permitted to authorize disbursal of funds held by the bond trustee. It is clear that if Lomelo and Leibowitz had not converted the bond funds to their own use, they would have been applied to public improvements for the benefit of the people of the City of Sunrise. The fraudulent acts of Lomelo and Leibowitz deprived the citizens of Sunrise of money and property by making it necessary for the City to expend other funds on the public improvements that the bond issue was designed to fund.[14]

Lomelo claims that this case is controlled by *United States v. Italiano*, 837 F.2d 1480 (11th Cir.1988) and *United States v. Conover*, 845 F.2d 266 (11th Cir.1988). In *Italiano*, the Eleventh Circuit held that the defendant's conviction for bribing county commissioners in order to obtain a cable television franchise was invalid under *McNally*. The defendant's conviction was also set aside in *Conover*, a case involving a kickback scheme, where it was not shown that the victim would have paid a lower price for certain services or received a better quality product absent the kickback.

We find these cases easily distinguishable. The only scheme mentioned in the *Italiano* indictment was one to defraud citizens of good government and of their right to have the county business conduct-

ed in an ethical manner. The court found that "[i]n this case, the grand jury state[d] what it found the citizenry was deprived of: good government." 837 F.2d at 1485–86. The *Conover* indictment also lacked any allegation that the victims of the scheme were deprived of money or property. 845 F.2d at 269.

■ In the instant case, the indictment alleged a scheme to defraud the victims of intangible rights *as well as* to divert public funds for fictitious purposes. Reviewing the transcript, it is clear that the case at trial turned on the question of (a) whether Leibowitz was being paid for fictitious services or whether he actually performed them, and (b) whether Lomelo knew that Leibowitz was not performing the services for which he was being paid. This finding is supported by the fact that the court instructed the jury, per Lomelo's request, that it should acquit Lomelo "if the evidence in the case left it with a reasonable doubt whether the accused ... in good faith believed the bills Craig Smith and Associates submitted to the City of Sunrise were truthful and not fraudulent at the time they were submitted." We find that despite the intangible rights language in the indictment, the trial of this case involved a traditional fraud scheme that does not implicate *McNally*.

### B. The Jury Instructions

Lomelo also argues that the jury instructions were insufficient to guard against conviction on the basis of a deprivation of intangible rights. It is clear that the deficiency in the jury charge was a key factor in the *McNally* decision. *McNally* involved a scheme whereby Howard Hunt, chairman of the state Democratic Party, used his de facto control over selection of the state's insurance agents to arrange kickbacks, in the form of commissions, to an insurance agency in which he and McNally had an interest.[15]

---

**14.** In addition, it appears that the money for at least two of the projects, "84 South" and "Utilities," did not involve a special bond issue, but came directly from City funds.

**15.** The Wombwell Insurance Company, which for some time had acted as the state's insurance agent for securing a workman's compensation policy, agreed with Hunt that in exchange for a continued agency relationship with the state, it

The mail fraud count in the *McNally* indictment alleged that Hunt had devised a scheme to defraud the citizens and government of Kentucky of their right to have the Commonwealth's affairs conducted honestly. After holding that section 1341 was only designed to protect people from schemes to deprive them fraudulently of their money or property, the Supreme Court stated as follows:

> [A]s the action comes to us, there was no charge and the jury was not required to find that the Commonwealth itself was defrauded of any money or property. It was not charged that in the absence of the alleged scheme the Commonwealth would have paid a lower premium or secured better insurance. Hunt and Gray received part of the commissions but those commissions were not the Commonwealth's money.... Indeed, the premium for insurance had to be paid to some agency, and what Hunt and Gray did was to assert control that the Commonwealth might not otherwise have made over the commissions paid by the insurance company to its agent.

483 U.S. at 360–61, 107 S.Ct. at 2882.

Finding that the jury charge permitted a conviction for conduct not within the reach of section 1341, the Court overturned McNally's conviction.

In the instant case, the jury was instructed that "[w]hat must be proved beyond a reasonable doubt is that the Defendant under consideration knowingly and willfully devised or intended to devise a scheme to defraud substantially the same as the one alleged in the indictment." As noted above, Count II of the indictment contains intangible rights language; the jury charge itself, however, makes no mention of any intangible rights. The charge defined the word "scheme" as "any plan or course of action intended to deceive others, and to obtain by false or fraudulent pretenses, representations, or promises, money or property from persons so deceived."

■ In reviewing a jury charge, the court "must examine the charge as a whole rather than isolating and examining the deficiencies of individual instructions." *Dynalectric*, 859 F.2d at 1573. Lomelo stresses that the jury was not specifically instructed that in order to prove mail fraud, the government had to demonstrate that the City of Sunrise or its citizens suffered a loss of money or property. Lomelo reads *McNally*, as interpreted by the Eleventh Circuit in *Italiano* and *Conover*, to require that the jury be specifically instructed that the city or its citizens suffered economic loss due to the fraudulent scheme. We disagree. The deficiency of the instructions in *Italiano* and *Conover* resulted from the fact that the scheme at issue was such that the jury could have found the defendants guilty without finding that they deprived anyone of money or property. In addition, the indictments in those cases mentioned only deprivation of intangible rights and the jury instructions restated the charges of the indictment. *See Italiano*, 837 F.2d at 1487, *Conover*, 845 F.2d at 270.[16] This is not so in the instant case. The factual basis of Lomelo's scheme, as described in the indictment, involved the fraudulent taking of government funds. The indictment alleged that the citizens of Sunrise were defrauded of these funds as well as honest government. We find that the jury instructions, which refer to the indictment, would not have led the jury to convict on an intangible rights theory alone.

Lomelo, citing *Chiarella v. United States*, 445 U.S. 222, 237 n. 21, 100 S.Ct. 1108, 1119 n. 21, 63 L.Ed.2d 348 (1980),

---

would share any resulting commissions in excess of $50,000 a year with certain specified insurance agencies, including Seton Industries, a company owned by Hunt and operated by McNally. Hunt did not disclose his ownership interest in Seton to other persons in state government.

**16.** In *Conover,* the court noted that "[t]he jury instruction allowed the jury to convict the defendants upon a finding either that the 'detriment' to Seminole was the unfaithful service of Conover or the payment of a 'bribe' or 'kickback'.... Because we cannot preceive [sic] that the jury convicted the defendants on the ground that they unlawfully deprived Seminole of money or tangible property, we are compelled to vacate the convictions." 845 F.2d at 271 (citations omitted).

argues that if a jury is instructed on alternate theories of punishment, a conviction cannot stand when one of the theories is an improper basis for punishment. *See also Zant v. Stephens,* 462 U.S. 862, 881, 103 S.Ct. 2733, 2745, 77 L.Ed.2d 235 (1983). This argument does not apply to Lomelo's case. First, parts (a) and (b) of paragraph 2 of Count II of the indictment, mentioning intangible rights and economic loss respectively, are linked together by the word "and" and not "or." Thus, the jury was not presented with alternative bases for conviction.

More important, we find that uncertainty as to the grounds for conviction can be eliminated because any verdict on the substantive mail fraud counts (Counts II through VII) must have been based on the actions taken to carry out the underlying scheme as set forth in paragraphs 3 through 7 of Count II. These paragraphs, incorporated by reference into Counts III through VII, detail the manner in which false invoices were used to divert funds to Leibowitz. Parts (a) and (b) of paragraph 2 of Count II simply set out two different objectives of the same scheme, but these objectives do not exist independently. Despite Lomelo's assertions to the contrary, we see no way in which the jury, given the scheme involved, could have found Lomelo guilty of entering into a scheme designed to defraud citizens of honest government without finding that he also schemed to deprive them of money or property.

Our finding in this case is in keeping with this court's decision in *Dynalectric.* The indictment in that case charged the defendants with a scheme to deprive the county and the United States of America of "(a) money; and (b) their right to free and open competition for bidding on the ... project, such bidding to be conducted honestly, fairly and free from craft, trickery, deceit, corruption, dishonesty and fraud." 859 F.2d at 1572. The court found that:

> While it also charges that the defendants schemed to defraud the victims of their right to open competition, the indictment is not worded in a way that would allow the jury to choose between the two theo-

ries. Rather, to convict the defendants in accordance with the indictment, the jury must have concluded that there was a scheme to defraud the victims of money *and* the right to open competition. *Id.* (emphasis in original).

The jury instructions in *Dynalectric* were essentially the same as those in the instant case. There, the jury was instructed that to convict it had to find a scheme "substantially the same as the one alleged in the indictment." *Id.* at 1573. As in the instant case, "scheme" was defined as "includ[ing] any plan ... intended to deceive others and to obtain by false or fraudulent pretenses money or property from the person so deceived." *Id.* The *Dynalectric* court took note of the fact that the use of the word "include" in the definition of "scheme" meant that the scheme to defraud *could* include the fraudulent taking of intangible rights. However, the *Dynalectric* court, agreeing with the Sixth Circuit,[17] found that the definition of "scheme," focusing on the deprivation of money or property, combined with the absence of any jury instruction specifically allowing conviction on the basis of intangible rights, rendered *McNally* inapplicable. *Id.* at 1574. In the instant case, we find that a review of the jury instructions as a whole leads to the conclusion that the focus here was on the deprivation of money and property. The instructions do not mandate setting aside the conviction.

In light of the wording of the indictment and the nature of the scheme described, we find that Lomelo has not demonstrated actual prejudice due to the inclusion of intangible rights language in the indictment.

Concluding that Lomelo's conviction for mail fraud is valid, we need not reach the question of whether his conviction on the extortion count should be vacated due to prejudicial spillover of the evidence. The conviction is therefore AFFIRMED on all counts.

**17.** *See United States v. Horton,* 847 F.2d 313, 320 (6th Cir.1988).